Anthony C. Varbero (AV8833)
Joseph A. Mure, Jr. & Associates
26 Court Street, Suite 2601
Brooklyn, New York 11242
(T) (718)841-9100
(F) (718) 797-5554
Email: anthony.varbero@murelaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TIC Park Centre 9, LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br>vs.<br><br>Mark Joseph Wojnar, Patricia A. Wojnar, Michael Manuel Cabot, Catherine Cabot, Jason M. Kraus, Jeffrey K. Miller, Mariner Property Management Services, LLC, a Delaware limited liability company, WTK Realty, LLC, a Florida limited liability company, Park Centre Med-Suites, LLC, a Florida limited liability company, Gardens Med-Suites, LLC, a Florida limited liability company, Medical Practice Operations, Inc., a Florida corporation, ABC Corporation, XYZ limited liability company, John Doe, and Mary Roe,<br><br>                    Defendants. | **COMPLAINT (JURY TRIAL DEMANDED)** |

Plaintiff alleges as follows for its Complaint against Defendants.

## INTRODUCTION

1.  This is an action for fraud- and theft-based claims, arising out of Defendants' unlawful conduct that resulted in the loss of a more than ten-million dollar private investment held by twenty-seven mostly elderly and retired individuals.

2.  TIC Park Centre 9, LLC ("Plaintiff") seeks to recover compensatory and other damages, including the loss of more than $3 million, hundreds of thousands in attorneys' fees and other

out-of-pocket expenses, and additional damages, which were caused by the fraud, theft, and related misconduct of Defendants, acting in concert, to actively bring about and make certain the September 2014 foreclosure of the multi-million dollar commercial real estate project, commonly known as Mariner Park Centre (the "Property"), in which Plaintiff had invested.

### THE PARTIES

3.  Plaintiff is a Delaware limited liability company with its a principal place of business and principal office located at 260 Beach 138th Street, Rockaway Park, New York 11694.

4.  Plaintiff's sole member is Nor Gee Real Estate Holding Corp. ("Nor Gee"), a New York corporation with a principal office located at 260 Beach 138th Street, Rockaway Park, New York 11694.

5.  At all relevant times, Plaintiff owned a 17.897% of tenant-in-common ("TIC") interest in the Property, with Nor Gee having invested more than $2 million through TIC 9 in connection with the TIC investment described below.

6.  Plaintiff is also the holder, by assignment, of all rights of TIC Park Centre 13, LLC, which owned at all relevant times a 8.949% TIC interest, having invested more than $1 million.

7.  Defendants Mark J. Wojnar ("Wojnar") and Patricia A. Wojnar, husband and wife, are Massachusetts residents now living on information and belief at 6 Oak Hill Park, East Sandwich, Massachusetts 02537.

8.  Defendants Michael M. Cabot ("Cabot") and Catherine Cabot, husband and wife, are Florida residents now living on information and belief at 263 Saratoga Boulevard East, Royal Palm Beach, Florida 34111.

9.  Cabot is the brother of Carlton P. Cabot of Cabot Investment Properties, LLC ("Cabot Investments"), a defendant named in a June 18, 2014 civil RICO filing brought by the State of

Massachusetts Securities Division for "fraud in the offer and sale" of TIC interests between 2003 and 2013, as well as the subject of a June 2, 2015 indictment by the United States Department of Justice in New York for fraudulent conduct in connection with the syndication of TIC interests. *See attached Exhibit 1, Superseding Indictment dated October 7, 2015 in USA v. Cabot, 1:15-cr-00680-JMF (S.D.N.Y.); see also ECF  No. 48, Consent Preliminary Order of Forfeiture/Money Judgment following guilty plea, and Exhibit 2, Boston Globe, "Cabot stepson, partner face criminal fraud charges", July 24, 2015.*

10. Wojnar was an employee of Cabot Investments until starting the Mariner Entities discussed below in late 2006 with Cabot. *See attached Exhibit 3, http://www.costar.com/News/Article/New-TIC-Syndicator-Drops-Anchor-in-Miami/84727  (Dec. 7, 2006), "New TIC Syndicator Drops Anchor in Miami."*

11. Wojnar and Cabot are the owners and alter egos of a series of entities they created to operate the fraudulent scheme that is the subject of this action, including Mariner Park Centre H, LLC, Mariner Park Centre M, LLC, Mariner Park Centre S, LLC, Mariner Asset Management, LLC, Mariner Asset Management Services, LLC, and Mariner Property Management Services, LLC (the "Mariner Entities"), all of which are inactive Delaware limited liability companies that were formerly registered at 12230 West Forest Hill Boulevard, Suite 110-L, Wellington, Florida 33414.

12. Although unknown to Plaintiff and the other Property owners, for several years, between 2007 and 2012, Wojnar and Cabot operated the Mariner Entities without regard to corporate formality, with adequate capitalization, as a façade for personal economic benefit, and as a single economic enterprise, including without limitation commingling personal and business funds, including funds entrusted to them for other purposes, with the bank accounts of the Mariner

Entities.

13. Wojnar and Cabot used the Mariner Entities' bank accounts and corporate shield to embezzle, harbor, and wrongfully take and shield monies rightfully belonging to Plaintiff and other Property owners, the Property's mortgage lender, and the Property's tenants.

14. Despite knowing about the allegations asserted in this action, Wojnar and Cabot did not wind up the Mariner Entities in accordance with the governing law, including without limitation providing compensation for known claims or notice to creditors such as Plaintiff or the Property's mortgage lender or tenants, the Mariner Entities were dissolved for failing to pay required taxes and/or fees, and Wojnar and Cabot allowed the Mariner Entities to lapse knowing those entities owed liabilities to others, including Plaintiff.

15. Wojnar and Cabot, having learned to operate and personally benefit from an unlawful TIC investment scheme from their association with Carlton Cabot and Cabot Investments, acted through the Mariner Entities by selling Regulation D exempt TIC securities to twenty-seven individuals, including Plaintiff, in connection with the Property.

16. On information and belief, Wojnar, Cabot, and their wives are owners and alter egos of a series of yet more real estate related limited liability companies that may have unlawfully received monies or incomes from the Property.

17. Wojnar and Cabot operated their Mariner Entities, and their related entities, without regard to corporate formalities, including specifically but without limitation by commingling revenues and monies among a flurry of numerous bank accounts, paying personal expenses and unrelated expenses with others' monies or monies dedicated or obligated to other purposes, and they operated the Mariner Entities to accomplish the unlawful conduct described in this Complaint, including the fleecing of the Property's rents and incomes.

18. To further their unlawful scheme, Patricia A. Wojnar and Catherine Cabot were the nominal owners, through "charitable trusts," of Defendant WTK Realty, LLC ("WTK"), an inactive Florida limited liability company, with a registered address at 1601 Belvedere Road, Suite 200E, West Palm Beach, Florida 33406, and a principal address at 316 Southwind Court, Suite 107, North Palm Beach, Florida 33408; Wojnar and Cabot were the alter egos and beneficiaries of the "charitable trusts" that owned WTK, which was itself an alter ego of the Mariner Entities, Wojnar, and Cabot.

19. Wojnar and Cabot created WTK solely for the unlawful and fraudulent purpose of concealing monies wrongfully taken from the Property's incomes, namely, leasing commissions, without the knowledge or consent of Plaintiff or any of the other Property owners, and then using the monies for personal and family benefits.

20. To further their unlawful scheme, Wojnar and Cabot engaged a business partner in connection with the Mariner Entities, Defendant Jeffrey K. Miller ("Miller"), an individual now living on information and belief at 204 Lone Pine Drive, Palm Beach Gardens, Florida 33410. *See attached Exhibits 4-6, http://www.floridainvestor.net/includes/todaynews.php?id=116, "Mariner Asset Management Services Names Jeff K. Miller Marketing Consultant," Dec. 21, 2009; May 20, 2010 Lake Mary City Comm'n Minutes,* "Jeff Miller is the liaison" for Mariner; http://www.wftv.com/news/news/construction-to-begin-on-heathrow-health-city/nLF7M/, "Construction to Begin on Heathrow Health City," June 8, 2010, "Miller is consulting" on a Mariner project.

21. In connection with his purported role as a "consultant" for the Mariner Entities, Miller organized, owned, and was the alter ego of Park Centre Med-Suites, LLC ("Park Centre") and, later, Gardens Med-Suites, LLC ("Gardens Med-Suites"), both of which are inactive Florida

limited liability companies with a registered address at 11211 Prosperity Farms Road, Suite C-301, Palm Beach Gardens, Florida 33410, and both of which served as the additional façade for Miller's other alter ego Defendant Medical Practice Operations, Inc., a Florida entity solely owned and controlled by Miller.

22. Miller formed Park Centre and Gardens Med-Suites solely for the purposes of carrying out the fraudulent Leasing Schemes described below, he operated both entities as the sole owner and managers, without regard to corporate formalities (in the case of Gardens Med-Suites, without having incorporated the entity when initially having engaged in the unlawful conduct described below), and solely to skim rental monies from the Property without the knowledge or consent of Plaintiff or the other TIC owners.

23. To further their unlawful scheme, Wojnar and Cabot employed Defendant Jason M. Kraus ("Kraus"), whose last known address was 316 Southwind Court, Apartment 107, North Palm Beach, Florida 33408, and who was, on the one hand, an "investment relations" employee with the Mariner Entities, and on the other, a nominal owner of WTK along with Wojnar's and Cabot's wives' "charitable trusts," and Kraus was the unlawful recipient of more than $42,000 in Property income.

24. To further their unlawful scheme, Wojnar, Cabot, Miller, and Kraus, acting in concert to convert more than $130,000 in rental monies owed to the subject Property between 2011 and 2012, and a total of at least $420,000 in rent over the 2011-2016 time period. *See attached Exhibit 7, Midgard Mgmt., Inc. v. Park Centre Med-Suites, LLC*, 114 So.2d 302 (Fla. 3d DCA 2013) (*rehr'g and rehr'g en banc denied*) (calling for "disgorgement" or rental monies and characterizing one of the Mariner Entities' scheme as "unmitigated chutzpah").

25. Wojnar, Cabot, Miller, and Kraus also acted in concert to deprive the Property of

$164,848.59 in broker commissions during this time period.

26. Further, Wojnar, Cabot, Miller, and Kraus acted in concert to ensure the total loss of Plaintiff's investment, $3 million, by fostering and encouraging the Property's foreclosure in September of 2014.

27. ABC Corporation, XYZ limited liability company, John Doe, and Mary Roe are unknown entities and persons to whom Defendants may have fraudulently transferred assets, who are alter egos of Defendants, or who are Defendants' co-conspirators now unknown to Plaintiff.

## JURISDICTION AND VENUE

28. This Court has subject-matter jurisdiction over all claims asserted in this Complaint under 28 U.S.C. § 1332 because Plaintiff (including Plaintiff's sole member, a New York citizen), on the one hand, and all Defendants (Massachusetts, Florida, or Delaware citizens), on the other, are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29. This Court has personal jurisdiction over all Defendants, who have substantial connections to this state based on their numerous general and specific contacts to New York, including without limitation having directed the unlawful acts described in this Complaint to New York, sending communications through the United States Mail or by Federal Express to Plaintiff's New York address, entering into and conducting meetings in New York with Plaintiff in furtherance of their unlawful scheme, and causing harm and damages in New York, as further described below.

30. This Court's personal jurisdiction over all Defendants is additionally based on their conspiracy to commit fraud in which all Defendants actively participated to cause damage to

7

Plaintiff; Defendants' actions as described below had the purpose and effect of intentionally advancing their conspiracy through the commission of substantial acts and omissions in New York and/or directed to New York, including without limitation by traveling to New York to meet with and induce Plaintiff to invest more than $2 million into the Mariner Entities' scheme, and to answer Plaintiff's questions and induce Plaintiff to remain invested in the Mariner Entities' scheme, and sending dozens of written representations, including misrepresentations described below, about the Property and the investment, which were delivered to Plaintiff in New York, though the United States Mail, Federal Express, and by email. *See, e.g., Exhibit 8, copies of Mariner Entities' mailings to Plaintiff's New York address, post marked June 2012.*

31. This Court is an appropriate venue for this action, as a substantial amount of the harm, damages, losses, and other unlawful acts described in this Complaint were deliberately directed to and occurred in this District.

### DEFENDANTS' TIC INVESTMENT SCHEME

32. In 2006, Wojnar and Cabot formed the Mariner Entities for the purpose of buying and re-selling TIC interests to private investors.

33. Before 2006, Wojnar had worked for Cabot's brother, Carlton Cabot. *See Exhibits 1-2 ("Mariner was founded this year by two investors, both of whom have ties to a fellow TIC syndicator, Cabot Investment Properties LLC. The president is Michael M. Cabot, brother of Cabot president Carlton Cabot. The CEO is Mark Wojnar of Boston, who was once in charge of asset management and acquisitions at Cabot."); ("Manhattan U.S. Attorney Charges [Carlton Cabot and Timothy Kroll] of [Cabot Investment Properties LLC] For Defrauding Investors Of Over $17 Million."); see also Case No. 1:15-cr-00680-JMF Dkt. No. 48 (guilty plea on Count II agreeing to forfeit $17 million).*

8

34. In 2006 and 2007, having learned from Carlton Cabot, Wojnar and Cabot created the Mariner Entities to solicit investments and sell TIC securities to twenty-seven investors (the "TIC Investors"), including Plaintiff, through a Private Placement Memorandum ("PPM").

35. Under Internal Revenue Service guidelines, Rev. Proc. 2002-22, TIC-owned real estate purchased with 1031-exchanged funds, like the Property, requires that any leases must be bona fide leases for federal tax purposes, and rents must be at fair market rates.

36. The PPM promised (1) tax deferral on the sale of real estate exchanged for the investment in the Property, (2) TIC interests in the Property, (3) competent and experienced management of the Property, and (4) a return on investment.

37. Wojnar and Cabot sold the TIC investments (through their Mariner S entity), managed the Property (through their Mariner Property Management entity), and retained for themselves a one percent TIC interest (through their Mariner H entity).

38. Wojnar and Cabot used the Mariner H entity to illegally funnel transfers of money among the Mariner Entities' various bank accounts and into their personal and/or family accounts, and for use on personal expenses.

39. The investors, including Plaintiff, purchased TIC interests in the Property, each taking a fractional share of the entire estate for a total investment in excess of $10,000,000, and each being required to form special-purpose limited liability companies (i.e., TIC 9) in order to invest.

40. On information and belief, about ninety-five percent of the TIC owners' members are elderly and used their retirement assets to buy TIC interests in the Property based on representations Wojnar and Cabot made in the offering documents.

41. Under the Property and Assessment Management Agreement (the "Property Management Agreement") among Plaintiff, the other TIC Investors, and Mariner Property

Management Services, LLC ("Mariner Property Manager"), one of the Mariner Entities of which Wojnar and Cabot were the alter egos, Mariner Property Manager provided property management services for the Property for the benefit of the TIC Investors and was a fiduciary of the TIC Investors.

42. Under the Property Management Agreement, and under the TIC Agreement that governed the Property's ownership structure, TIC approval was required for leases and the annual renewal of the Property Management Agreement.

43. Further, only independent brokers could receive leasing commissions, and all leases had to be for fair market value, through arm's-length transactions, and could not be with affiliates.

44. In 2007, in reliance on representations and promises in the PPM, Plaintiff exchanged real estate held in New York and invested just over $2 million for a 17.896% TIC ownership in the Property, the largest of all investors Wojnar and Cabot solicited.

45. Wojnar traveled to Brooklyn, New York in March of 2007 to meet with Plaintiff's owner, to have him sign the investment materials, and to induce the $2 million investment.

46. From 2007 until 2011, Wojnar or Cabot sent correspondence by United States Mail or FedEx to Plaintiff in New York, requesting approval for purported leases and purported construction projects, purporting to identify the details of the proposed lease or construction project, as well as making capital call requests to pay for the various construction projects, leasing commissions, tenant improvements, and other expenses Wojnar and Cabot claimed were reasonable and necessary.

47. Wojnar and Cabot mailed this correspondence to Plaintiff's New York address regarding the Property and the TIC investment, including soliciting additional funds, purportedly to help further capitalize or stabilize the investment, but in fact to personally enrich Wojnar and Cabot.

48. On December 6, 2010, Wojnar visited Plaintiff's owners at an office in Secaucus, New Jersey and met with Plaintiff's principals for more than one hour to address Plaintiff's questions about the Property's financial statements, accounting, income, expenses, leases, construction projects, and overall management.

49. During this in-person meeting, Wojnar claimed that all accounting and bank records were detailed and showed the Property's income and expenses, provided explanations for the Property's construction management fees, property and asset management fees, and leasing commissions, and gave positive projections as to Mariner's plans for the Property.

50. As Plaintiff would later learn, many of these representations were materially false or misleading.

51. Wojnar and Cabot controlled the Property's bank accounts and handled all aspects of the Property's financial management, including what was disclosed to Plaintiff and the TICs, until Mariner's termination and resignation effective December 31, 2010.

52. Wojnar and Cabot were fiduciaries to Plaintiff and the TIC owners with respect to the Property and the collection, use, and management of the Property's incomes as well as Plaintiff's and other TIC owners' additional capital infusions made at the request of capital calls from Wojnar and Cabot.

**THE TICS DECLINE TO RENEW MARINER'S MANAGEMENT AGREEMENT**

53.     Toward the end of 2010, Wojnar and Cabot began making capital calls to Plaintiff and other TIC owners, purportedly to pay for construction projects, the Property's mortgage loan, and other expenses.

54.     Wojnar and Cabot issued an October 12, 2010 resignation, stating that Mariner's management would resign effective December 31, 2010 (the date that Property Management

Agreement would expire unless unanimously approved by all TIC owners).

55.     Wojnar and Cabot reiterated on November 19, 2010 that Mariner would resign as the Property's manager effective December 31, 2010.

56.     In December 2010, Plaintiff and other TIC owners declined to approve Mariner as the Property's manager, rendering Mariner's management terminated effective December 31, 2010.

57.     After December 31, 2010, without authority (after having both resigned and been terminated), and through false pretenses, Wojnar and Cabot continued to collect the Property's rents, keep the rents and security deposits for themselves, and not pay the Property's mortgage loan or other expenses, all the while requesting and receiving from certain TIC owners substantial capital calls and making other misrepresentations.

58.     For example, on February 22, 2011, March 22, 2011, and April 15, 2011, Wojnar and Cabot issued written requests to Plaintiff and the other TIC owners requesting additional capital calls, falsely stating that (a) additional TIC investment funds paid to Wojnar and Cabot would be used to pay the Property's delinquent mortgage loan payments; (b) Wojnar and Cabot had personally guaranteed the mortgage loan, had spoken with the mortgage lender, and could structure a deal with the mortgage lender to avoid the Property from falling into special servicing and foreclosure, so long as Plaintiff and the other TIC owners released and indemnified Wojnar and Cabot from any liability; (c) that the Property's lender had not approved a new property manager Midgard Management, Inc. ("Midgard"), when in fact Midgard had been approved. *See Exhibits 9-12*.

59.     By March 2011, the Property was delinquent on its mortgage, owing more than $453,000, and the Property was placed into special servicing by the mortgage lender.

60.     As late as April 2011, Wojnar and Cabot continued to demand that the TICs make "capital calls" and continued to collect the Property's rents from tenants. *See Exhibits 9-11.*

61.     Wojnar and Cabot did so knowing that at least some of the mostly elderly and retired TIC investors did not know what was going on with the investment and would simply send money to Wojnar and Cabot, while all investors, including Plaintiff, did not know and could not have discovered that Wojnar and Cabot were continuing to collect rents from the Property's tenants and keeping the rents for themselves.

62.     Mariner did not have authority to take any actions for the Property after December 31, 2010—much less collect the Property's income—and the Property's mortgage lender acknowledged this when placing the Property into default and special servicing in 2011.

63.     The TICs selected a new manager, Midgard, which began managing the Property in April 2011, however, Wojnar and Cabot began to actively assert to the other TIC owners, tenants, and others that Midgard was not the lawful manager.

64.     Plaintiff requested during this time period copies of the accounting records and Mariner H's consent to new property management, which Wojnar and Cabot stated they would provide if the TIC owners personally released Wojnar and Cabot from liability.

65.     Midgard, Plaintiff, and other TIC investors spent the first half of 2011 paying rents, penalties, fees, and other monies to the Property's mortgage lender to get out of the default and right the ship, which they finally did, and the mortgage lender accepted Midgard and the new management without Mariner's consent—and despite Wojnar's and Cabot's attempts to deprive the Property of any manager and force it into foreclosure.

66.     By June 2011, most of the TIC owners, including Plaintiff, had contributed approximately $935,363 to pay the Property's mortgage lender all unpaid rent, interest, default

interest, penalties, and attorneys' fees that were caused by Wojnar's and Cabot's actions, including the deprivation of rents following their termination as the Property's manager.

67.     While this expenditure of funds, including Property funds, permitted the Property to avoid foreclosure in 2011, it irreparably harmed the Property and its owners' cash flow, capital, and ability to continue maintaining the Property, leading toward its foreclosure in September of 2014.

68.     Wojnar's and Cabot's continued interference with the Property's management and their theft of rents and revenues irreparably diminished the Property's ability to cash flow and enter into new leases, leading to the Property's eventual foreclosure.

**DEFENDANTS' CONSPIRACY TO CONCEAL EVIDENCE OF WRONGDOING**

69.     In early 2011, Wojnar and Cabot promised to provide Plaintiff the accounting records showing the sources and uses of all of the Property's rents and accounts, claiming the records were in "storage."

70.     Although unknown to Plaintiff, Wojnar, Cabot, and their affiliates stole from the Property's bank accounts and rents and defrauded the TICs in several ways that were designed to conceal the nature of the payments.

71.     Wojnar and Cabot took monies, including reserves, from the Property's bank accounts, from the TIC investors directly through capital calls, and from the Property's rents, yet the income that the Property received, or that the Property should have received from tenants, greatly exceeded the Property's legitimate expenses, and Wojnar and Cabot did not pay the Property's mortgage loan causing it to default.

72.     Wojnar and Cabot used the TICs' monies, accounts, and rents for illegitimate purposes, did not account for the monies, and disguised payments to Wojnar, Cabot, and their

wives, employees, business partners, and attorneys, through seemingly legitimate expenses such as tenant improvements, reimbursements, construction projects, broker fees, "deferred asset management fees," and countless "expenses" that had no benefit or relation to the Property.

73.     By way of example only, Wojnar and Cabot issued numerous Property account checks payable to "cash," "Mariner H," "Lake Mary 46A," a settlement with a former Mariner employee, legal fees defending an arbitration filed by Mariner's former counsel against Mariner, Mariner's owners' car insurance premiums, an unknown contractor who appeared to have several unknown jobs at the Property, and numerous others who were not entitled to receive any payment from the Property's monies. *See by way of example the attached Exhibit 13.*

74.     Cabot also harbored a $150,000 "loan" from his sister Melanie in Mariner's accounts, however, he was later forced to disgorge this amount to a bankruptcy trustee. *See Exhibit 2*.

75.     Wojnar and Cabot refused to pay a contractor for work at the Property (the building-out referenced in one of the Leasing Schemes described below), requiring the Property's precious operating expenses to be used to satisfy a mechanic's lien during a time when the Property could ill afford such an expense.

76.     Wojnar and Cabot set up trusts for their wives to own WTK, which in turn acted as a "broker" for the Property, and which in turn received at least $164,848.59 in "leasing commissions" from at least three leases (two of which were leases with Wojnar's business partner Miller, who was also serving as Mariner's "marketing consultant."

77.     Wojnar did not account for the security deposits from the Property's leases, and he and Cabot took thousands in rents after Mariner's December 31, 2010 termination, without paying the Property's mortgage.

78.     Wojnar acknowledged receiving approximately $18,000 from two of the TIC owners after termination, and as late as April 12, 2011, Wojnar and Cabot continued to demand rents from tenants although they had no authority to do so.

79.     The large number of Mariner accounts, the flurry of bank transactions, and the comingling of monies showed Wojnar and Cabot were operating the Mariner Entities as a sham to fraudulently steal Plaintiff's and the other TIC owners' money.

80.     An independent forensic accountant prepared an interim report of Wojnar's and Cabot's accounting and identified numerous questionable accounts, transactions, and expenses, missing revenues, and irreconcilable revenue and expense accountings. *See attached Exhibit 14.*

81.     Wojnar and Cabot misrepresented the nature of the Property's leasing activity to Plaintiff and other TIC owners to conceal payments to themselves, their employees, wives, and business partners.

82.     As a direct result of Defendants' misconduct, Midgard, as agent for Plaintiff and the other TIC owners, was thrust into litigation to recover the Property's rents and incomes in five lawsuits and an appeal, ultimately resulting in the Property's foreclosure due to the deprivation of the Property's income, and the total loss of Plaintiff's and others' investment.

83.     As a direct result of Defendants' misconduct, Plaintiff and other investors suffered legal expenses, loss of the return on their investment, and the loss of hundreds of thousands of dollars in Property revenues, eventually putting this multi-million dollar investment into foreclosure, destroying the investment, and possibly causing adverse tax consequences.

**DEFENDANTS' LEASING SCHEMES**

**A.  The Fraudulent Park Centre Med-Suites Lease.**

84. As part of Mariner's October 2010 resignation, Wojnar and Cabot mailed to Plaintiff and other TIC owners a purported "term sheet" for a ten-year lease of part of the Property to Miller's Park Centre Med-Suites, LLC entity, for approximately $10,000 per month, with a $370,000 tenant-improvement allowance (the "Park Centre Lease"). *See attached Exhibit 15.*

85. In fact, unknown to Plaintiff, Wojnar and Miller had already signed the Park Centre Lease on July 15, 2010, and on the same day Miller signed a sublease (the "Park Centre Sublease") with a  tenant who would pay Miller approximately $17,625 per month for five years, permitting Miller, Wojnar, and Cabot to pocket more than $420,000 over the lease term.

86. Nowhere in the term sheet for the Park Centre Lease provided to the TIC Investors did Wojnar or Cabot disclose that the Park Centre Lease and the Park Centre Sublease were already executed and that the rent under the sublease was approximately $7,000 per month in excess of the rent that the TIC Investors would receive under the Park Centre Lease.

87. Nowhere in the term sheet for the Park Centre Lease provided to the TIC Investors did Wojnar or Cabot disclose that the transaction called for an approximately $490,000 tenant-improvement buildout, which the Property's revenues or reserve accounts would be required to pay up front, or that a commission from the transaction would be paid to Wojnar and Cabot through the WTK entity.

88. The Park Centre Lease was a sham that allowed Miller, Wojnar, and Cabot to unlawfully siphon off, at the expense of Plaintiff and the other TIC Investors, the difference between the less-than-market rent to be paid under the Park Centre Lease and the market rent to be paid under the Park Centre Sublease.

89. Neither Plaintiff nor the other TIC owners had heard of Miller until the middle of 2011, nor did the Mariner Entities disclose that Miller was their "marketing consultant."

90. Miller, Wojnar, and Cabot secretly prepared the Park Centre Lease without telling any of the TICs and without receiving their requisite consent, even though the Park Centre Lease could lawfully not be executed with any of Mariner's affiliates, any lease had to be for fair market value, and all TICs had to approve leases.

91. Since the time Plaintiff had purchased it investment interest in the Property, Mariner Property Manager routinely provided formal requests for approval of leases, or term sheets for leases, to the TIC owners, because the TIC Investors could only approve a lease if they knew what the proposed terms of it were.

92. None of the TIC Investors disapproved of the Park Centre Lease, justifiably relying on the material false omissions presented to them in the October 2010 term sheet presented to them by Wojnar and Cabot.

93. If the TIC Investors had known the truth about the arrangement with Park Centre, and the Sublease, one or more of the TIC Investors, including Plaintiff, would have disapproved of the Park Centre Lease.

94. Wojnar and Cabot knew the TIC Investors would rely on the material representations and omissions in the term sheet and would not have approved the Park Centre Lease if the TIC Investors were told the truth about the Park Centre Lease and Park Centre Sublease.

95. As the manager of the Property on behalf of the TIC Investors, Mariner Property Manager, Wojnar, and Cabot had a fiduciary duty to disclose all material facts about the Park Centre Lease and Park Centre Sublease to the TIC Investors.

96. Miller knew that Mariner did not have authority to enter into the phony Park Centre

18

Lease and related documents without the consent of the TICs, Miller knew the phony Park Centre Lease was not for fair market value, and Miller knew the TIC owners would never agree to permit the Park Centre Sublease that would deprive the Property of more than $420,000 in rent.

97. The Park Centre Lease sought to employ WTK (Kraus) as Miller's broker, and pay a leasing commission to WTK, which (unknown to Plaintiff or the TIC owners) was controlled by Wojnar and Cabot.

98. Wojnar, Cabot, Miller, and Kraus knew that the Property was owned by twenty-seven TIC owners whose consent would be required for the entire lease transaction, as the TIC Agreement was a matter of record, and Park Centre Lease itself referenced the TIC owners.

99. Plaintiff and the other TIC owners knew nothing of this scheme, nor could they have discovered the scheme, because Wojnar, Cabot, and Miller had hidden the true nature of the lease in a fake term sheet that was provided to the TIC investors including Plaintiff.

100.    Thus, Wojnar, Cabot, Miller, and Kraus fraudulently concealed the Park Centre Lease's true tenancy and terms, as well as other material aspects, including the duration, the amount of square footage to be leased, the amount of tenant improvements required, the amount of common-area-maintenance ("CAM") the tenant would pay (i.e., the October term sheet stated $41,400 per year when it fact the actual Park Centre Lease signed earlier required no payments), and the fact that the net revenue to the Property from the true lease was only one third of what Wojnar and Cabot had disclosed to Plaintiff and the other TIC owners.

101.    The one-half million dollar shortfall resulted in approximately $100,000 per year in lost income, or about a $1 million decrease in the Property's value.

102.    Plaintiff and the other TIC owners would not learn until much later that the Park

Centre Lease was not an arms' length transaction for fair market value, but in fact was a fraudulent scheme designed to fleece the Property's incomes for payment to Wojnar, Cabot, their marketing consultant Miller, and their employee Kraus.

103.     Under the terms of the undisclosed lease, the actual tenant (a prior tenant at the Property whose existing lease had been terminated early in order to permit the Park Centre Lease scheme to proceed) would receive almost a half-million dollars in tenant improvements despite a short (five-year) lease term, plus the other unusual aspect of a waiver of approximately $196,000 in CAM expenses over the lease term.

104.     In addition, the Park Centre Lease failed to meet mandatory requirements that Wojnar and Cabot knew the federal tax laws and the Property's mortgage loan required, including but not limited to the following:

- Not at Fair Market Rate. Any lease in which the landlord is a group of TICs must be priced so that "rents paid by a lessee . . . reflect the fair market value for the use of the property." IRS, Rev. Proc. 2002-22. The Park Centre Lease's $10,000 per month rent was not fair market value, as demonstrated that its actual value was expressed in the sublease, which was $17,625 per month.

- Mariner Executed The Park Centre Lease Without Authority. Wojnar and Miller executed the Park Centre Lease on June 15, 2010, having never received the consent of the mortgage lender, Plaintiff, nor any of the TICs, in violation of the Management Agreement, the TIC Agreement, and the mortgage loan.

- Miller Secured Unauthorized And Prohibited Discounts and Concessions. The Park Centre Lease included a complete waiver of CAM and a reduced term (compared to that required to "amortize" such an expensive build-out). This was a violation of the

Management Agreement, the Property's mortgage loan documents, and IRS guidelines.

- <u>The Park Centre Lease Was A Prohibited Insider Transaction</u>. The Management Agreement prohibited Mariner from leasing "any space in the Project to itself or to any of its affiliates or subsidiaries." As such, the Park Centre Lease with Miller, Mariner's affiliate, was prohibited.

105.    Miller created Park Centre solely for the Park Centre Lease scheme and dominated the entity to such an extent that Park Centre has no existence independent of Miller, and Park Centre has never had any purpose other than to divert the Property's rent monies to Miller and the Mariner Entities.

106.    Miller used Park Centre solely for his own personal gain, and without any legitimate business purpose, such that it would be inequitable not to disregard the corporate veil and hold Miller personally liable for Park Centre's debts, obligations, and other liabilities as alleged in this Complaint.

107.    Miller shared the first two rent checks that Park Centre received from the subtenant, in March and April 2011, with Mariner, on the one hand, and Miller transferred the remaining money that Park Centre received from the Property's rents to himself and another entity he owned, Defendant "Medical Practice Operations, Inc.," through checks dated March 7, 2011, March 23, 2011, April 1, 2011, April 19, 2011, and May 11, 2011, in addition to an amount of approximately $30,000 - $40,000 that he received in 2012 from the Property's rents, which he was ordered by a court to return but never did, thereby contributing to the Property's foreclosure. *See Exhibit 16.*

108.    Mariner and WTK were mere alter egos of Wojnar and Cabot, as demonstrated by the manner in which they used the Property's revenues to pay for personal items and expenses,

did not maintain corporate formalities, commingled funds among numerous bank accounts, and operated the Mariner Entities and WTK with the purpose of defrauding Plaintiff and the other TIC investors.

109.     When Mariner received the first two rent checks from Miller based on the fraudulent Park Centre Lease, in March and April 2011, Mariner had been terminated as the Property's manager for several months, yet Wojnar and Cabot pocketed the money for themselves and actively helped Miller frustrate Midgard's management of the Property, including the payment of the Property's debt service, by litigation assistance.

### B.  The Fraudulent Gardens Med-Suites Lease.

110.     Like the Park Centre Lease scheme, Wojnar, Cabot, Miller, and Kraus hatched a duplicate scheme with another part of the Property.

111.     On an unknown date in 2010, Wojnar, on behalf of Mariner as the Property's manager, and Miller, as a purported tenant of the Property, executed a five-year lease for a portion of the Property (the "Gardens Lease"), at the monthly rate of $14,245, with a required security deposit of $15,300 and a required first-month's rent.

112.     Like the Park Centre Lease, the Gardens Lease sought to employ WTK as Miller's broker and pay a leasing commission to WTK, the entity owned by Kraus and Wojnar's and Cabot's wives' "charitable trusts."

113.     Miller signed the Gardens Lease purportedly on behalf of an entity known as Gardens Med-Suites, LLC; that entity did not exist, however, meaning that Miller signed the Gardens Lease in his personal capacity.

114.     The Gardens Lease was not disclosed to, nor approved by, any of the Property's TIC owners, in violation of the Management Agreement, the TIC Agreement, and the Property's

mortgage loan.

115.     Once discovered, Miller, Wojnar, and Cabot refused to terminate the Gardens Lease, which remained a cloud on the Property and caused that portion of the Property to be un-lettable for several years.

116.     Miller never paid the required first month's rent, the security deposit, or any other rent of any kind under the Gardens Lease, while at the same time maintaining the right to possess the premises and clouding the title to the premises under the Gardens Lease from 2010 until September 2014, thereby rendering it unable to be re-let.

117.     Mariner Property Manager, Wojnar, and Cabot had duty, including a fiduciary duty, to disclose the existence of the Gardens Lease and to enforce the lease against Gardens Med-Suites, LLC and Miller for the benefit of the TIC Investors.

118.     Mariner Property Manager, Wojnar, and Cabot knew that if they had sought the TIC Investors' approval of the Gardens Lease, as required, the TIC Investors would not have approved it because it was with an affiliate rather than arm's length, not for fair market value, and intended to deprive the Property of income from the actual tenant.

119.     In all material respects, the Gardens Lease scheme was identical to the Park Centre Lease scheme, both of which deprived the Property of substantial incomes and both of which irreparably cost the Property substantial revenues to try to remedy.

120.     As with the Park Centre Lease scheme, Wojnar and Cabot spent significant time and resources helping Miller frustrate Midgard's management, including ensuring the Gardens Lease would tie up a portion of the Property and render it un-lettable, and therefore denying income to the Property in an effort to cause the foreclosure and conceal Defendants' thefts and misconduct.

### C.  The Fraudulent WTK Leasing Commission Scheme.

121.     In connection with the Park Centre Lease and Gardens Lease schemes, among other leases at the Property, including the Chen Medical Associates, Design Neuroscience Center, Believers in Christ Ministries, Miami Regional Dialysis, and Halsey & Griffith leases, Wojnar and Cabot caused no less than $164,848.59 in broker commissions from the Property's income to be paid or payable to WTK, the entity nominally owned by their wives' "charitable trusts" as well as Kraus, who was a Mariner employee. *See Exhibits 17 and 18.*

122.     Wojnar and Cabot knew the Property's governing documents, including the Property's mortgage loan documents, the TIC Agreement, and the Mariner Management Agreement, did not allow the Mariner Entities to receive broker commissions from leases of the Property.

123.     Despite knowing this, and in an effort to deceive Plaintiff and the other TIC owners, Wojnar and Cabot established WTK to enrich themselves unlawfully with Property incomes.

124.     For example, for Chen Medical Services, there were *three* brokers receiving commission, one for the landlord and two for the tenant, of which WTK received a share, yet Wojnar and Cabot did not disclose any of this self-dealing to Plaintiff or the other TIC owners.

125.     As disclosed for the first time during a September 24, 2013 forensic-investigator interview with Kraus, Wojnar and Cabot established WTK as a vehicle both to receive unlawful payments from the Property's leases as well as pay Kraus income for his employment with the Mariner Entities (because Wojnar and Cabot had insufficient Mariner funds to pay Kraus as an employee after they spent the Property's revenues for their personal expenses).

24

### THE LEASING SCHEMES CAUSE THE PROPERTY TO LOSE INCOME

126.     None of the Leasing Schemes were disclosed to the TIC owners, nor were they permitted by the Management Agreement or the Property's mortgage loan documents.

127.     In 2011, after the TIC owners finally regained control of the Property, Midgard commenced eviction actions against Park Centre and Miller, because Midgard discovered that no rent had been paid on either the Park Centre Lease or the Gardens Lease, and because Midgard had not received from Mariner the accounting records.

128.     Midgard brought civil actions against Miller and his Entities, as well as Wojnar's and Cabot's WTK entity and Kraus, seeking the recovery of rents, eviction, and leasing commissions, in order to help the Property stay afloat.

129.     These actions were *Midgard Management, Inc., et al. v. Park Centre Med-Suites, LLC, et al.*, Case No. 11-26932-CA-01-41 (and related appeal to the Florida Court of Appeals); *Midgard Management, Inc., et al. v. Gardens Med-Suites, LLC, et al.*, Case No. 12-07610-CA-01-24; *Midgard Management, Inc., et al. v. WTK Realty, LLC, et al.*, Case No. 12-13675-CA-22; and *TIC Park Centre 9, LLC v. Park Centre Med-Suites, LLC, et al.*, Case No. 12-36570-CA-01-32 (collectively, the "Midgard Actions").

130.     To conceal their misconduct and to drive the Property into loan default and foreclosure, Wojnar, Cabot, Miller, and Kraus opposed the Midgard actions.

131.     Miller's and Kraus's papers and pleadings filed in the Midgard Actions were drafted in coordination with Wojnar, Cabot, or their agents, and Wojnar and Cabot provided affidavits and other materials to assist Miller and Kraus in opposing the Midgard Actions and trying to prevent Midgard from collecting rents or managing the Property.

132.     In 2013, the Florida Court of Appeals ordered "disgorgement" of the rental

monies from Miller's entity to Midgard. *See Midgard Mgmt., Inc. v. Park Centre Med-Suites, LLC*, 114 So.2d 302 (Fla. 3d DCA 2013) (*rehr'g and rehr'g en banc denied*) ("disgorgement" allowed against Miller's attorney for "unmitigated chutzpah.").

133.     However, Miller ignored the Florida Court of Appeals' mandate, refused to return more than $130,000 in rent money to Midgard, and actively touted the Property's impending loan default and foreclosure as grounds for why he would not return the money.

134.     Despite the ruling in *Midgard*, all Defendants refused to return rents or other monies to Midgard, and all Defendants continued to actively try to deprive the Property of income and resources so that it would fall into loan default and foreclosure.

## DEFENDANTS ACTIVELY STARVE THE PROPERTY.

135.     Wojnar and Cabot knew that insufficient funds could eventually cause a foreclosure.

136.     In fact, as to each TIC investor, including Plaintiff, they once threatened, "The investment capital committed by each TIC will likely be wiped out forever with no future chance to recover . . . ."

137.     Wojnar and Cabot also knew the adverse tax consequences the TIC owners could suffer from a foreclosure because they threatened, "A deficiency notice will likely be issued by the lender which must be reported by each TIC to the IRS as income for the difference between the amount of the loan and the amount realized in a foreclosure sale."

138.     Thus, Wojnar and Cabot knew that losing the Property could cause Plaintiff and the other TIC owners to lose their entire investment.

139.     Yet in early 2011, as the Property's mortgage loan was becoming delinquent, and after Mariner had both resigned and been terminated as the Property's manager, Wojnar and

Cabot not only pocketed the Property's incomes but also demanded that Plaintiff and the other TIC owners make additional capital contributions, all under the false promise that such contributions would be dedicated to paying the Property's mortgage loan.

140.    In an April 29, 2011 correspondence to Plaintiff and the other TIC owners, Wojnar demanded over $850,000 from the TICs, even though the Property's lender at that point had acknowledged Midgard, and not Mariner, as the duly authorized Property manager.

141.    From 2011 – 2014, Wojnar and Cabot actively helped Miller and Kraus by submitting affidavits, making appearances, and filing objections to subpoenas in the Midgard Actions to oppose Midgard and try to deprive the Property of income so that it would fall into foreclosure and forever conceal their misconduct.

142.    From 2011 – 2014, Wojnar and Cabot issued correspondence to Plaintiff and the other TIC owners, saying falsely that Midgard had no authority to collect rents or enter into leases, demanding that Midgard withdraw the Midgard Actions that were aimed at Wojnar's and Cabot's WTK entity and their business partner Miller's Entities, and threatening legal actions—all with the intent to prevent Midgard from collecting the Property's rents and pay its expenses, including its mortgage loan obligations.

143.    Wojnar's wife and Cabot's wife filed objections to subpoenas issued by Midgard, which would have sought information about the transfer of Property income to their "charitable trusts."

144.    Wojnar's and Cabot's goal was to delay and stop the actions from proceeding and to end further investigation into the Mariner financial accounting and use of the Property's income.

145.    Wojnar filed an affidavit for Miller in the Park Centre Lease eviction, and Cabot

personally appeared at one court hearing to support Miller in the Gardens Lease eviction.

146.     Wojnar and Cabot actively helped Miller in trying to defeat Midgard by sending in affidavits contesting Midgard's authority.

147.     From the beginning, it was clear that Miller was acting on Wojnar's and Cabot's behalf, with the goal of paying Property income to Wojnar and Cabot and taking a cut.

148.     Bank records show the same scheme for other third parties that Wojnar and Cabot owed money to, whereby Property income was diverted to pay for expenses and vendors not associated with the Property and not lawfully authorized to receive Property income.

149.     Wojnar, and Cabot, Miller defended the Park Centre Lease eviction by contending that Plaintiff and the TIC owners had not lawfully retained Midgard as the Property's new manager—a position later characterized by the Florida Court of Appeals as "unmitigated chutzpah".

150.     Miller, Wojnar, and Cabot resisted eviction for both premises, insisting that the Gardens Lease remained in effect, and directly prevented any other lease for the premises between 2010 and September 2014, when the Property was foreclosed.

151.     The unlawful Gardens Lease caused Plaintiff and other owners to suffer litigation expenses to try to clear the title to the premises, and prevented the receipt of income to the Property, thereby contributing to the Property's foreclosure and the loss of Plaintiff's investment.

152.     But it was the Park Centre Lease that caused the most irreparable damages in the form of lost rents and legal expenses.

153.     Through drawn out litigation between mid-2011 until the present, Miller, Wojnar, and Cabot insisted that no rent need be paid to Midgard, thereby depriving the Property of much needed rents as well as causing it to incur legal fees.

154.     From May of 2011 until May 8, 2013, Midgard and the TICs were required to pursue a massive legal battle to recover possession and at least $130,000 in stolen rents from Miller, who was actively aided by Wojnar and Cabot.

155.     Miller ensured that rents payable under the Park Centre Lease from the subtenant were diverted directly to Miller.

156.     Although the rental monies were disputed, Miller kept the rental monies and, on information and belief, shared an undisclosed amount with Wojnar and Cabot.

157.     Miller, Wojnar, and Cabot knew that the Property needed funds to pay its mortgage to avoid falling into another default and foreclosure.

158.     As the Florida Court of Appeals would later conclude, the Park Centre Lease scheme (and thus by extension the Gardens Lease scheme) was a sham. *See Midgard Management, Inc. v. Park Centre Med-Suites, LLC, et al.*, 114 So.3d 302 (Fla. 3d D.C.A. 2013) (*rehearing and rehearing en banc denied*) (holding that Midgard was the Property's manager notwithstanding "clever" argument that would permit Park Centre to "pocket" rent money, and concluding that Midgard could pursue "disgorgement" of the rent monies from Miller's counsel).

159.     Despite the appellate court's ruling, however, and despite demands made beginning in May 2013, Miller did not return any rent money to the Property.

160.     Throughout 2013 and into 2014, Miller delayed hearings, contending that the Property was going into loan default and, thus, neither he nor his attorney should have to return any of the Property's rents.

161.     Despite knowing that the Property badly needed rents to pay its mortgage loan, for over two years Miller refused to return the Property's rents and actively delayed court rulings, requiring Midgard to incur litigation expenses that could otherwise have been used to

pay the Property's expenses including its mortgage loan.

162.    In fact, specifically citing the Property's April 2013 loan default and October 2013 foreclosure proceeding as grounds to not have to return any of the Property's money, Miller and his attorney claimed they were entitled to keep the rents.

163.    Miller later filed a malpractice claim against his counsel, after a court ordered the rent monies disgorged; however, by then it was too late for the Property, and even to this day Miller never returned any of the rent monies.

164.    Defendants' actions directly caused and contributed to placing the Property's loan into default, causing the Property's foreclosure, and sealing the fate of Plaintiff's investment.

165.    At the same time, Wojnar and Cabot had ensured that WTK and Kraus received at least $164,848.59 in "broker's commissions" from at least two leases, including the Park Centre Lease and the Gardens Lease, even though there were already actual brokers employed for leasing activity (and even though no broker would have been required for a purported lease with Wojnar's business partner).

166.    WTK's and Kraus's receipts of "commissions" were disguised payments of Property income to Wojnar and Cabot, and salary to Kraus, none of which was disclosed to Plaintiff or the other TIC owners.

167.    Kraus, Wojnar, and Cabot refused to return the unlawful broker commissions to Midgard, which otherwise would have helped pay the Property's mortgage loan.

168.    Miller, while refusing to return the Property's rents to Midgard, also began "representing" Kraus in the defense of Midgard's suit to recover the leasing commissions.

169.    Miller actively helped Kraus, Wojnar, and Cabot to facilitate the Property's foreclosure, to permit Defendants to keep their ill-gotten gains from the Property's incomes, and

to silence any further inquiries or remedies relating to the Property's rents.

## DEFENDANTS INTENTIONALLY DESTROY EVIDENCE AND TRY TO STOP THE INVESTIGATION

170.    In December 2010, in connection with transferring the Property's management from the Mariner Entities to a new property manager, Plaintiff asked that Wojnar and Cabot provide records pertaining to their management of the Property.

171.    Although Wojnar and Cabot provided some documents, they delayed providing all accounting records identifying the sources and uses of all of the Property's income from 2007 through early 2011.

172.    Through investigation, Plaintiff discovered that, between approximately 2007 and early 2011, the time period when Wojnar and Cabot were in control of the Property's management, there was about $1.8 million in Property income that could not be accounted for, including rental monies unlawfully collected after Mariner's resignation on December 31, 2010 and tenant security deposits that had disappeared.

173.    Among other things, Wojnar's and Cabot's companies collected the Property's rents from tenants up through April 2011, after they had been terminated or resigned as the Property's manager, and at the same time none of those rents were used to pay the Property's mortgage loan, which went into default.

174.    Further, Plaintiff discovered various checks written out to "cash," "Mariner H," "Lake Mary 46A," and other recipients that were not connected to the Property's management.

175.    Moreover, Wojnar and Cabot had taken the Property's security deposits that would be owed to the Property's tenants.

176.    On June 16, 2014, Donald Southerland, a former FBI agent, contacted Cabot and advised him that he was investigating Wojnar's and Cabot's financial transactions when in

31

control of the Property and conducting a forensic audit.

177.    Mr. Southerland asked Cabot to provide a series of financial records and explain various transactions when Wojnar and Cabot were in control of the Property.

178.    Cabot said that he had the documents in storage and all the information needed and would respond promptly.

179.    These documents included the following:

- All bank statements;

- All cancelled checks;

- All supporting documentation for bank deposits;

- All wire transfer notices;

- A copy of the computerized accounting records maintained on Quickbooks;

- All tax returns;

- All W-2's and 1099's issued by Mariner;

- All purchase invoices and receipts;

- All Rent invoices and any other revenue documentation;

- All Security Deposits records;

- All other relevant financial documentation.

180.    On June 20, 2014, Mr. Southerland received a call from Cabot promising to cooperate with the investigation.

181.    During a June 24, 2014 phone call, Cabot promised that he and Wojnar would fully cooperate in the investigation by providing the financial records requested except for the computerized accounting records maintained on Quickbooks because he claimed that the laptop computer these records were maintained on had "disappeared."

182.    Cabot claimed to have a "shoebox of flash drives" with his accounting records and "lots of binders" that he would provide Mr. Southerland.

183.    Cabot promised to be "an open book" and said he was "willing to send information to Mr. Southerland for him to do his job."

184.    Cabot said that he had "binders" and "check registers" that showed the information that we were looking for and that he would have it copied and sent to Mr. Southerland.

185.    On June 26, 2014, Cabot reiterated that he would provide Mr. Southerland with the requested documents.

186.    Mr. Southerland did not hear or receive anything from Cabot.

187.    On August 7, 2014, Cabot told Mr. Southerland that Cabot would not provide any of the requested financial records because Wojnar had brought a "harassment" complaint against Nor Gee's president, Mr. Linares.

188.    Because Wojnar and Cabot knew they were under investigation for possible criminal, illegal, or unethical conduct, Wojnar and Cabot destroyed the accounting records and brought a "harassment" complaint against Nor Gee's president to prevent further investigation.

189.    This harassment complaint was a ruse because, in August 2014, Wojnar stated he would drop his harassment complaint against on the following terms:

- Nor gee would obtain a release of any liability against Wojnar and Cabot; and

- Nor Gee's president would pay Wojnar $100,000.

190.    The Massachusetts court summarily dismissed Wojnar's "harassment" complaint, concluding that it was designed to improperly influence civil litigation.

191.    Wojnar and Cabot never provided Mr. Southerland any documents.

192.     Similarly, in a September 24, 2013 interview with forensic examiner Sutherland, Kraus promised to provide documentation of Kraus's right to receive Property incomes as "broker" commissions; however, Kraus never provided Southerland any of these documents.

## THE FORECLOSURE AND LOSS OF THE INVESTMENT

193.     In March 2013, Midgard had insufficient operating income from rents, as well as outstanding legal expenses from the Mariner litigation, which resulted in a missed payment on the Property's mortgage loan.

194.     Based on the missed March 2013 mortgage payment, the Property's lender declined to accept partial mortgage payments and placed the Property into special servicing.

195.     All Defendants were aware of the loan default and actively worked to ensure the Property would be foreclosed so that no money would have to be repaid.

196.     In November 2013, the Property's lender commenced a foreclosure action, due to the deprivation of income from the Park Centre Lease, the Gardens Lease, and the related litigation. *See US Bank v. Mariner Park Centre H, LLC, et al.*, Case No. 13-031249CA (Circuit Court, Miami-Dade County, Florida).

197.     Miller actively exploited the loan default in an effort to refuse to return the rents that he had received into his trust or operating account, including filing pleadings in opposition to disgorgement that asserted Plaintiff no longer had any right to the rents.

198.     When finally forced to disgorge the rents, Miller's attorney only provided a portion of the rents into a state court registry, and since then he has actively tried to retrieve the rents (including by an assumption agreement that arose after Miller sued his attorney for malpractice).

199.     On September 12, 2014, the Property's lender foreclosed on the Property and

became the Property's owner.

200.     The foreclosure sale destroyed Plaintiff's $3 million investment in the Property, along with the millions invested by the other TIC investors.

201.     The September 2014 loss of Plaintiff's investment was directly caused by the concerted unlawful actions of all Defendants.

## COUNT I– FRAUD (WOJNAR AND CABOT)

202.     Plaintiff incorporates herein the above Paragraphs.

203.     As set forth above, Wojnar and Cabot made false statements to both Plaintiff and others concerning specific material facts, including without limitation the actual sources and uses of the Property's incomes, leases, leasing terms, and broker arrangements, the rights or authority to collect rents from the Property after December 31, 2010, the use of those rents and monies, and the rights and authority of the Property's new manager Midgard from April 2011 through September 2014.

204.     Before December 31, 2010, Wojnar and Cabot owed contractual and fiduciary duties, as the Property's manager, to provide accurate descriptions of leases to be approved by Plaintiff and other TIC owners, to abide by the TIC Agreement, Mariner Management Agreement, and the Property's mortgage loan documents with respect to arm's length transactions, and to use the Property's incomes and revenues only for allowable expenses and not for personal or unauthorized purposes.

205.     After December 31, 2010, Wojnar and Cabot continued to owe fiduciary duties as the custodians of rents and other monies belonging to the Property that they were wrongfully collecting.

206.     Plaintiff and the other TIC owners could not have known the truth of the

fraudulent Leasing Schemes, or how Wojnar and Cabot were actually using the Property's rents and incomes, because Wojnar and Cabot were, until May of 2011, solely in possession of the Property's management and its bank accounts, and to this day, Wojnar and Cabot have refused to provide the Property's complete financial records despite promising to do so.

207.   Wojnar and Cabot knew their statements were false and intended their false statements to induce Plaintiff and others to rely on the false statements, because the Property's rents and incomes were actually used for Wojnar's and Cabot's personal benefit and not for the Property, the leasing and broker schemes were falsely represented, Wojnar and Cabot were on notice of the actual proper use of the Property's rents and incomes as they had drafted the transactional documents, and Wojnar and Cabot knew they had no authority or right after December 31, 2010 to collect or use any of the Property's rents.

208.   Wojnar and Cabot also knowing omitted material facts about the Property's leases and broker commissions, including without limitation that the leases were not for fair market value, contained a sublease that had already been signed and was designed to skim nearly half a million dollars in rent over the lease term, and not at arm's length, and that the broker commissions were designed to personally enrich Wojnar's and Cabot's families rather than pay arm's length brokers.

209.   Wojnar and Cabot further made materially false representations to the Property's tenants and the TIC owners, from January through April of 2011, that Mariner was entitled to collect rents and manage the Property; these misrepresentations allowed Wojnar and Cabot to obtain from tenants and at least some TIC owners monies that should have been paid to the Property for payment on the mortgage loan; by obtaining money under these false pretenses, Plaintiff and the other TIC owners suffered irreparable damages because the Property was

36

deprived of money, ultimately leading to its foreclosure and the loss of Plaintiff's investment.

210.    Plaintiff has suffered damages caused by detrimental but reasonable reliance on these false statements and misleading omissions, namely, the complete loss of its investment.

### COUNT II– NEGLIGENT MISREPRESENTATION (WOJNAR AND CABOT)

211.    Plaintiff incorporates herein the above Paragraphs.

212.    As set forth above, Wojnar and Cabot had a fiduciary obligation to Plaintiff and the other TIC owners, before Mariner's termination on December 31, 2010, to provide correct information about proposed leases and broker commissions when requesting approval.

213.    This fiduciary obligation arose from Mariner's role as the Property's manager, and Wojnar and Cabot were Mariner's principal, and Wojnar's and Cabot's superior knowledge of the Property's mortgage loan and expenses, ability to collect and access rents and incomes from the Property, and ability to negotiate and present leases for Plaintiff's approval.

214.    The Leasing Schemes imparted false information, and materially misleading omissions, about the true nature and effect of the leases and broker commissions, including the sublease, the Transfer Premium, the below-market-value and non-arm's-length transactions, and the skimming of rents and commissions by Wojnar and Cabot, through their agents Miller and Kraus.

215.    Wojnar and Cabot had duties to correctly provide all pertinent information about the leases and the broker commissions so that Plaintiff and others could make informed decisions, yet Wojnar and Cabot failed to provide accurate or complete information.

216.    Plaintiff and the other TIC owners reasonably relied on the false information Wojnar and Cabot provided, Plaintiff and the other TIC owners had no way of knowing the truth about the leases and could not have discovered the truth until Midgard began managing the

Property in May of 2011.

217.   As a direct result of Wojnar's and Cabot's negligent misrepresentations, Plaintiff has been damaged by the total loss of its $3 million investment, plus other damages to be proven with greater certainty at trial.

## COUNT III– FRAUD BY INDUCEMENT (WOJNAR AND CABOT)

218.   Plaintiff incorporates herein the above Paragraphs.

219.   Wojnar and Cabot made material written misrepresentations to Plaintiff and the other TIC owners in the lease schemes described above.

220.   These misrepresentations were designed to deceive, and did deceive, Plaintiff and the other TIC owners into allowing the Leasing Schemes to exist and continue.

221.   Plaintiff and the other TIC owners reasonably relied on these misrepresentations as they did not have the superior inside knowledge Wojnar and Cabot had by virtue of managing the Property and its financial affairs, and because Wojnar and Cabot had not disclosed the existence or relationship of the WTK, Park Centre, and Gardens Leasing Schemes.

222.   Wojnar's and Cabot's fraudulent inducement caused Plaintiff and the other TIC owners substantial damages and injuries, including without limitation the loss of Plaintiff's $3 million.

## COUNT IV– FRAUDULENT CONCEALMENT (ALL DEFENDANTS)

223. Plaintiff incorporates herein the above Paragraphs.

224. Defendants concealed or failed to disclose material facts as described above, including the true use of the Property's incomes.

225. Defendants knew or should have known the material facts should be disclosed, particularly because Plaintiff was requesting an accounting from Defendants.

226. Defendants knew their concealment of or failure to disclose the material facts would induce Plaintiff to act, including to continue to provide or permit capital or rents to be used to maintain the Property and its expenses, as well as to pursue recovery of the rents.

227. Defendants had a duty to disclose the material facts, including contractually (Wojnar and Cabot) or by court rules (Miller and Kraus).

228. Plaintiff detrimentally relied on the misinformation.

## COUNT V– AIDING AND ABETTING FRAUD (ALL DEFENDANTS)

229.    Plaintiff incorporates herein the above Paragraphs.

230.    As described above, Wojnar, Cabot, Miller, and Kraus engaged in a fraud against Plaintiff.

231.    Miller and Kraus knew of Wojnar's and Cabot's fraud as they actively worked together and assisted one another in perpetuating the Leasing Schemes involving the WTK, Park Centre, and Gardens entities to both unlawfully obtain the Property's monies and then also prevent recovery by Plaintiff, Midgard, and the other TIC investors.

232.    Miller and Kraus provided substantial assistance to Wojnar and Cabot to advance the commission of this fraud, including through the facts that Cabot and Wojnar employed Kraus and Miller as their agents, Cabot and Wojnar provided affidavits, research, and drafting assistance to Miller and Kraus, Cabot personally appeared in court with Miller to assist Miller's efforts in avoiding eviction and summary judgment, Miller objected to subpoenas directed toward the Mariner Entities and bank accounts held by Wojnar and Cabot, Miller took the misappropriated rents and, on information and belief, provided some to Cabot, Wojnar, or their representatives, and Miller actively sought to prevent Plaintiff's Property from receiving its rents so that the Property could continue into loan default and, ultimately, foreclosure.

233.    Kraus and Miller further knew about the fraud because they worked with Wojnar and Cabot, Kraus as Mariner's investor relations specialist, and Miller as Mariner's marketing consultant.

234.    As a result of these actions, Plaintiff and other TIC owners have suffered the loss of their multi-million dollar investment.

## COUNT VI– TORTIOUS INTERFERENCE WITH MORTGAGE CONTRACT (ALL DEFENDANTS)

244. Plaintiff incorporates herein the above Paragraphs.

245.    As set forth above, there was a valid mortgage contract to which Plaintiff and the other TIC owners were a party, on the one hand, and to which a mortgage lender, Wells Fargo Bank, N.A., was a party, on the other.

246.    Defendants all knew about the mortgage contract because it was a matter of record on the Property's title, and because the Leasing Schemes included reference to the mortgage loan documents and were subject and subordinate to the mortgage loan documents.

247.    Defendants intentionally interfered with Plaintiff's and the other TIC owners' ability and obligation to make mortgage loan payments by, among other things, the Leasing Schemes described above.

248.    Defendants' actions were intentional and knowing, which is further evidenced by Defendants having made threats to Plaintiff and the TIC owners that a foreclosure could result unless Plaintiff and the TIC owners provided Wojnar and Cabot a release.

249.    As a result of Defendants' intentional interference with Plaintiff's contractual relationship with the mortgage lender, Plaintiff suffered damages when the Property was foreclosed in September 2014, resulting in the total loss of Plaintiff's investment.

## COUNT VII – THEFT AND CONVERSION (ALL DEFENDANTS)

250.    Plaintiff incorporates herein the above Paragraphs.

251.    Defendants engaged in theft and conversion of rents, security deposits, and leasing commissions belonging to the Property's owners, in that Defendants wrongfully took control of the rents, security deposits, and leasing commissions at a time when Defendants had no authority to do so (after termination / resignation) and used those monies for personal purposes.

252.    Despite due demands for their return, Defendants refused to return the rents, security deposits, and leasing commissions.

253.    Defendants owed duties to hold in trust those rents, security deposits, and leasing commissions, particularly as Defendants at one point had contractual obligations to do so, and then, after the termination of the contractual obligations, Defendants acted fraudulently as fiduciaries in continuing to solicit from the Property's tenants additional rents that Defendants kept for their own purposes rather than tendering them to their rightful owners.

254.    In addition to the value of the more than $130,000 in rents wrongfully converted, the unknown amounts required to be maintained on deposit for tenants' security deposits, and the more than $160,000 in leasing commissions wrongfully converted, the rents and leasing commissions could have and should have been available to the Property to pay its mortgage loan and assist in preventing the Property's foreclosure, as well as the legal expenses incurred in trying to recover the converted rents and leasing commissions further deprived the Property of revenue to pay its mortgage loan.

255.    Defendants acted with felonious intent in converting the Property's rents and leasing commissions particularly as they acted with false pretenses and misrepresentations in the Leasing Schemes described above and further in tortiously interfering with the proper management of the

Property between 2011 and 2014 leading to and directly causing the Property's foreclosure.

256. Defendants have been or are being specifically placed on notice, and a written demand was properly made or is being made, under Fla. Stat. § 772.11, requiring that Defendants return the rental monies, security deposits, and leasing commissions to the Property.

257. As a result of Defendants' conversion and civil theft, the Property suffered a loan default and foreclosure, resulting in the loss of Plaintiff's multi-million dollar investment.

## COUNT VIII– CIVIL CONSPIRACY (ALL DEFENDANTS)

258. Plaintiff incorporates herein the above Paragraphs.

259. Wojnar, Cabot, Miller, and Kraus engaged in a conspiracy to do unlawful acts by unlawful means, namely, to deprive the Property of incomes and rents, to cause the Property to go into loan default and foreclosure, and to ensure that the Property was foreclosed to prevent discovery of or recourse against their misconduct.

260. This misconduct was fraudulent, as set forth above, in that it perpetuated the Leasing Schemes designed to, and that had the effect of, unlawfully taking the Property's incomes, Plaintiff's monies, and causing the Property to be foreclosed.

261. All Defendants performed overt acts in pursuance of the conspiracy, including fraud on the court in *Midgard* to ensure their misconduct would not be discovered or remedied and active assistance in ensuring Midgard could not manage the Property, collect all rents, or pay all expenses.

262. Plaintiff has been damaged as a result of Defendants' acts performed pursuant to the conspiracy, including through the loss of their multi-million dollar investment.

## COUNT IX– BREACH OF FIDUCIARY DUTY (WOJNAR AND CABOT)

263. Plaintiff incorporates herein the above Paragraphs.

264. The Mariner Entities, through their alter egos Wojnar and Cabot, were fiduciaries to Plaintiff and the other TIC owners with respect to collection and management of the Property's rents and incomes, by virtue of the Mariner Management Agreement.

265. Wojnar furthered this trust and confidence relationship by personally visiting Plaintiff's principals in December 2010 to assure Plaintiff that the Property's incomes, rents, expenses, tenants, loan, and management were in proper order.

266. As such, the Mariner Entities, Wojnar, and Cabot owed duties of loyalty to the TIC owners and the obligation to exercise due care with the TIC owners' money and the Property's incomes.

267. The Mariner Entities, Wojnar, and Cabot breached their fiduciary duty by falsely presenting the Leasing Schemes to gain TIC approval, misappropriating the Property's rents and incomes for their personal use, and for misleading and exploiting the TIC owners into making capital calls solely for the purpose of paying Wojnar and Cabot.

268. The Mariner Entities, Wojnar, and Cabot engaged in self-dealing, conflicts of interest, and the omission of material facts, all of which was the proximate cause of Plaintiff suffering substantial monetary damages, including the loss of a $3 million investment and other damages.

## COUNT X—AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (ALL DEFENDANTS)

269. Plaintiff incorporates herein the above Paragraphs.

270. As set forth above, Wojnar and Cabot had fiduciary obligations to Plaintiff and the other TIC investors in the Property, and Wojnar and Cabot breached those duties by perpetrating

the lease schemes.

271. Kraus and Miller actively participated in the Leasing Schemes and knowingly aided Wojnar's and Cabot's breaches of fiduciary duties by perpetuating and maintaining the WTK entity to receive unlawful broker commissions and the Park Centre and Gardens entities to receive undue rents.

272. As a result of Kraus's and Miller's aiding and abetting Wojnar's and Cabot's breaches of fiduciary duty, Plaintiff has suffered damages, including without limitation the loss of its $3 million investment.

## COUNT XI—UNJUST ENRICHMENT (ALL DEFENDANTS)

273. Plaintiff incorporates herein the above Paragraphs.

274. All Defendants were unjustly enriched and wrongfully benefited by their misconduct, and at Plaintiff's expense, as described above.

275. Substantial benefits were unknowingly conferred on Defendants by Plaintiff and the other TIC owners, or through their agent Midgard, namely, rents, leasing commissions, and other income from the Property, and Defendants accepted and retained those rents and incomes for their personal benefit, without any claim of right, and under circumstances that make in inequitable for Defendants to retain them without paying their value.

276. Equity and good conscience require Defendants to restitute and be held liable for all damages caused by their unjust enrichment, including the resulting loss of Plaintiff's multi-million dollar investment.

**WHEREFORE**, Plaintiff prays for the following relief:

    i.  Judgment for damages in excess of $3 million against all Defendants, jointly and severally;

    ii.   Statutory damages, as applicable, punitive damages, and attorneys' fees as an element of damages and as permitted by law;

    iii.   Prejudgment interest, attorneys' and expert fees, costs, and disbursements in connection with this action, as permitted by law; and

    iv.   Such other and further relief as the Court deems just.

Plaintiff reserves the right to amend this Complaint as discovery and investigation proceed, including without limitation to name additional responsible defendants, assert additional causes of action, and demand additional remedies including without limitation additional applicable statutory penalties, punitive damages, and attorneys' fees.

Respectfully submitted,

Date:  August 2, 2016

By: */s/ Anthony C. Varbero*
    Anthony C. Varbero (AV8833)
    JOSEPH A. MURE, JR. & ASSOCIATES
    26 Court Street, Suite 2601
    Brooklyn, New York 11242
    (T) (718)841-9100
    (F) (718) 797-5554
    Email: anthony.varbero@murelaw.com

    -and-

    Edward P. Sheu
    (*pro hac vice to be applied for*)
    BEST & FLANAGAN LLP
    60 South Sixth Street, Suite 2700
    Minneapolis, MN 55402
    (T):  (612) 339-7121
    (F): (612) 339-5897
    Email: esheu@bestlaw.com

    ATTORNEYS FOR PLAINTIFF

2435765